# IN THE COURT OF APPEALS OF IOWA

No. 20-0076
Filed July 21, 2021

IN RE THE MARRIAGE OF SUSAN GAYLE HUTCHINSON
AND ROBERT GREGORY HUTCHINSON

Upon the Petition of
SUSAN GAYLE HUTCHINSON,
        Petitioner-Appellee,

And Concerning
ROBERT GREGORY HUTCHINSON,
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Mitchell E. Turner,

Judge.


        Robert Hutchinson appeals the modification of the parties' dissolution

decree based upon his alleged extrinsic fraud. **REVERSED AND REMANDED.**


        Webb L. Wassmer of Wassmer Law Office, PLC, Marion, for appellant.

        Richard F. Mitvalsky of Gray, Stefani & Mitvalsky, P.L.C., Cedar Rapids, for

appellee.


        Heard by May, P.J., and Greer and Schumacher, JJ.

**MAY, Presiding Judge.**

The district court modified the property division in the decree dissolving Robert and Susan Hutchinson's marriage. Robert appeals. We reverse and remand.

## I. Background Facts & Proceedings

Robert and Susan were married in 1990. In 2000, Robert began working at General Electric (GE). On April 22, 2010, Susan filed a petition for dissolution of marriage. Susan was represented by counsel during the dissolution proceedings. Robert represented himself.

A mandatory discovery order required both parties to provide within sixty days of case filing "[c]opies of IRA accounts, retirement plans, 401k's, deferred compensation, savings plans and any other similar plan documents." It also required both sides to file an "affidavit of financial status." Susan filed an affidavit of financial status showing Robert had a GE retirement account worth $126,000. Robert never filed an affidavit of financial status.

Drafts of a proposed settlement document were circulated between the parties. Robert requested a reduction in the value of his Harley Davidson motorcycle, an adjustment to Susan's spousal support request, and adjustment to valuations of bank accounts, among other negotiations. Robert acknowledged he had a 401(k) plan through GE with a value of $126,000. But Robert did not disclose a GE pension plan, which had vested in 2007.

Robert and Susan eventually agreed to a division of marital assets. They agreed Robert would receive $250,434, including his GE 401(k) plan valued at $126,000, and Susan would receive $246,297. Susan would also receive spousal

support of $1200 per month for four years. The parties' stipulation stated, "Each party states that they have fully disclosed all of their assets, income and liabilities to the other and that each party has had full and fair opportunity to make inquiry as to the same or has waived such right." Under the provision for "Securities/Retirement Plans," the stipulation stated, "The parties have provided updated information to each other for the values of these accounts/plans as of June 2010, or the closest date for which financial information is available."

On October 29, Robert signed the stipulation at Susan's attorney's office. Susan signed it on November 1. Through their signatures, Susan and Robert swore "on oath" that they had "read" the stipulation "and that the statements" in it "are true." Both signatures were notarized.

Robert also signed a proposed decree, as did Susan's attorney. The proposed decree incorporated by reference the parties' stipulation, including particularly its "alimony and property settlement awards." The proposed decree included express findings

> that each party has fully disclosed all of their assets, income and liabilities to the other either in the form of financial affidavits or through sharing information. Each party has had a full and fair opportunity to make inquiry as to assets, income and liabilities of the other or waives same.

Through their signatures, Robert and Susan's attorney both approved the proposed decree "as to form and substance."

After it was signed, Susan's attorney submitted the proposed decree to the court. On November 2, the district court entered the proposed decree without alteration.

On October 29—four days before the decree was entered—Robert hand-delivered two separate forms to Susan's attorney. One form related to a premarital Fidelity account. The other was a blank GE consent form. Robert informed Susan's attorney that the purpose of the GE form was for Susan to release her death benefits so he could redirect them to his children.

The GE form included a portion entitled "Section 2: Spouse's Consent to Waive Right to Benefits." This portion included two check-boxes: one for a GE Pension Plan and one for a GE Savings & Security Program. It also included a line for the "Spouse's Signature."

On November 1, Susan signed the GE form. She left both boxes unchecked.

On November 12, Susan's attorney's office sent the signed GE form to Robert. Neither box was checked. The cover letter stated:

> Enclosed please find the original GE Enrollment Center Consent form which has been signed by Susan. Please confirm in Section 2 which plan you are participating in (GE Pension Plan or GE Savings & Security Program) *and check the appropriate box.* I have reviewed this with Susan and you have permission to do so. We would appreciate it if you would return a copy of the form (or scan and email) when Section 2 is complete. If you have any questions, please do not hesitate to call me or [Susan's attorney]. Thank you.

(Emphasis added.)

Robert checked *both* boxes and gave the GE form to his employer, GE. He did not send a completed copy of the form to Susan's attorney's office. Susan's attorney's office did not follow up with Robert to obtain a completed copy. Susan did not follow up either.

Fast-forward to September 3, 2015, nearly five years after the entry of the dissolution decree. Robert asked Susan to sign a satisfaction of spousal support judgment. They met at the University of Iowa Credit Union. At this meeting, Robert informed Susan he had retired and was receiving a "nice pension." When Susan noted that Robert never mentioned the pension in the divorce proceedings, Robert pointed to the satisfaction Susan had just signed and said, "It's too late. You can't do anything about it now."

Eight months passed. Then, on April 20, 2016, Susan commenced this action by filing a two-count petition to correct, vacate, or modify the dissolution decree. Her petition alleged Robert engaged in fraud by "failing to disclose the existence of" his GE pension plan "as part of the parties' Divorce Stipulation of Settlement." Susan asked for two forms of relief. Count I asked the court to "correct, vacate or modify" the 2010 dissolution decree "to now award to [Susan] a share of" Robert's GE pension plan. Count II requested a modification of the decree's spousal support award "[p]ursuant to Iowa Code section 598.21C."

In August, Robert moved for summary judgment. The court granted the motion as to count II but otherwise denied it. The case proceeded to trial on count I, Susan's request to modify the property division.

At trial, Robert testified that "the pension wasn't a given at [the] time [of the dissolution in 2010]." However, he admitted that the GE pension plan had vested in 2007. His pension was based on 169 months of employment at GE. He was married for 121 of those months. But Robert conceded that the GE pension plan was not mentioned in the settlement documents. Robert also testified Susan did

not "deserve any of the pension." Robert said, "She's taken everything I've had in the past, and now she's going for more?"

The district court found Robert intentionally deceived Susan about the existence of the pension plan and all of the elements of fraud were met. The court also found Susan's case was not time-barred because Robert's fraud was "extrinsic" and "could not have been discovered earlier in the exercise of due diligence."

Turning to the topic of remedies, the court determined the stipulation showed the parties intended to equally divide the marital assets. The court found Susan should receive a pension benefit of $668.63 per month going forward. The court also ordered Robert to reimburse Susan $40,117.80 for the previous months he had been receiving a pension. The court specified that this amount would be paid from Robert's 401(k) accumulated under a subsequent employer, Integrated Sales. The court concluded the parties should each pay their own attorney fees for the action. However, Robert was ordered to pay $7056 of Susan's attorney fees as a sanction for misconduct during discovery.

Robert and Susan both filed motions pursuant to Iowa Rule of Civil Procedure 1.904(2). In response, the court made some changes to the language of its decision. Robert now appeals.

## II. Analysis

Robert argues the district court erred in (1) failing to dismiss Susan's request to modify the property division; (2) awarding Susan a partial interest in a retirement account; (3) failing to award him attorney fees because of his partial success at summary judgment; and (4) awarding excessive attorney fees to Susan

as a discovery sanction. Susan requests an award of attorney fees for this appeal. We address each issue in turn.

**A. Robert's issues on appeal**

*1. Was Susan entitled to modification of the decree's property division?*

Robert argues the district court should have dismissed Susan's request to modify the property division in their dissolution decree. We agree.

Under Iowa law, every decree of dissolution must "divide the property of the parties." Iowa Code § 598.21(1) (2016); *see In re Marriage of Thatcher*, 864 N.W.2d 533, 540 (Iowa 2015). Where, as here, no one appeals the dissolution decree, its property division is "not subject to modification." Iowa Code § 598.21(7); *see also Simon v. Simon*, No. 15-0814, 2016 WL 1703521, at *1 (Iowa Ct. App. Apr. 27, 2016) (noting collateral attacks on the property division are generally impermissible).

There are two exceptions. First, Iowa Rule of Civil Procedure 1.1012(2) permits an action at law to "correct, vacate or modify a final judgment or order" because of "fraud practiced in obtaining it."[1] But there is a time limit: Rule 1.1013(1) provides that "[a] petition for relief under rule 1.1012" must "be filed and served in the original action within one year after the entry of the judgment or order involved." This time limit is jurisdictional. *See, e.g.*, *Kern v. Woodbury Cnty.*, 14 N.W.2d 687, 688 (Iowa 1944) (concluding the trial court "had no jurisdiction to consider" a petition that was not filed and served within one year).

---

[1] Rule 1.1012 also permits an action for other reasons not relevant here.

8

The parties agree this one-year time limit precluded Susan from pursuing an action at law under rule 1.1012. Although the decree was entered in 2010, she did not commence this action until 2016, over five years later.

So we turn to the second exception. Even when an aggrieved party like Susan is time-barred from bringing an action *at law* under rule 1.1012, they may still be able to pursue claims of fraud *in equity*. But "[a] party attempting to vacate" or modify "a judgment in an equity suit has a heavy burden." *Johnson v. Mitchell*, 489 N.W.2d 411, 415 (Iowa Ct. App. 1992). They must clear three hurdles.

First, they must show the alleged fraud constitutes "extrinsic fraud" rather than "intrinsic fraud." *Id.*; *see Mauer v. Rohde*, 257 N.W.2d 489, 496 (Iowa 1977) ("A judgment may be collaterally attacked for fraud. However, the fraud must be extrinsic." (citations omitted)). Second, they must demonstrate that "reasonable diligence" would not have permitted them to "discover the fraud . . . within one year after the judgment." *Johnson*, 489 N.W.2d at 415. Finally, they must prove traditional elements of fraud, that is, "(1) misrepresentation or failure to disclose when under a legal duty to do so, (2) materiality, (3) scienter, (4) intent to deceive, (5) justifiable reliance, and (6) resulting injury or damage." *In re Marriage of Bacon*, No. 11-0368, 2011 WL 4579601, at *4 (Iowa Ct. App. Oct. 5, 2011) (citation omitted).

Our analysis begins with first hurdle, the requirement of "extrinsic fraud" rather than "intrinsic fraud." Because this distinction presents a legal issue, our review is for correction of errors at law. *See Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 219 (Iowa 2017).

In *Mauer*, our supreme court explained the distinction this way:

> Intrinsic fraud "occurs within the framework of the actual conduct of the trial and pertains to and affects the determination of the issue presented therein. It may be accomplished by perjury, or by the use of false or forged instruments, or by concealment or misrepresentation of evidence."
>
> Extrinsic fraud, on the other hand, has been described as that fraud which keeps a litigant from presenting the facts of his or her case and prevents an adjudication on the merits. Examples of extrinsic fraud are a bribed judge, dishonest attorney representing the defrauded client, or a false promise of compromise.

257 N.W.2d at 496 (citations omitted).

Susan claims Robert committed fraud by signing "on oath" the parties' stipulation, which "contained an explicit representation that each party fully disclosed all of his or her assets" *even though* Robert had actually *not* disclosed an asset, the GE Pension. She testified that Robert's "signature" on the stipulation was a "representation" on which she relied:

> Q. When you arrived on October 1, 2010, to [your attorney's] office, did you observe that Mr. Hutchinson had already signed the divorce Stipulation of Settlement? A. Yes.
>
> Q. Did you observe that he'd signed it under oath? A. Yes.
>
> Q. And the stipulation as we've discussed contains representations that everybody has made full disclosures of their assets, correct? A. That's right.
>
> . . . .
>
> Q. Did you rely upon Mr. Hutchinson's signature under oath in the representations in the stipulation that he made full disclosure of all of his financial accounts and retirement? A. Yes.
>
> . . . .
>
> Q. Susan, when you signed the Stipulation of Settlement, did you know that it had a requirement that you would attest that you fully disclosed your assets? A. Yes.
>
> Q. Do you feel that a sworn statement by one party making that kind of representation is something that you should be able to rely upon? A. Yes.
>
> Q. Did you rely upon Mr. Hutchinson's signature to the affidavit—to the Stipulation of Settlement that he had indeed fully disclosed all of his retirement assets and account and plans? A. Yes.

Q. And did you feel justified in relying upon that representation under oath? A. Yes.

Q. Did Mr. Hutchinson's signature affirming under oath that he had actually disclosed all of his retirement property—did that cause you to agree to the settlement? A. Yes.

Susan's claims of fraud match closely with *Mauer*'s definitions of "intrinsic fraud." *See id.* For one thing, *Mauer* defined "concealment . . . of evidence" as intrinsic fraud. *Id.* (citation omitted). This would seem to include Robert's concealment of his GE pension plan. *But see, e.g.*, *Bradley v. Bd. of Trs. of Washington Twp., Dubuque Cnty.*, 425 N.W.2d 424, 425 (Iowa Ct. App. 1988) (noting "[a] fraudulent concealment of facts which would have caused the judgment not to have been rendered will constitute extrinsic fraud").

Moreover, according to her testimony, the fraud on which Susan relied was Robert's false "representation," which he made under oath through his notarized "signature" on the stipulation. Under *Mauer*, this sort of fraud—"accomplished by perjury, or by . . . misrepresentation of evidence"—is intrinsic fraud. *See* 257 N.W.2d at 496 (citation omitted); *see also Phipps v. Winneshiek Cnty.*, 593 N.W.2d 143, 146 (Iowa 1999) ("A claim of false testimony constitutes intrinsic fraud."); *Bacon*, 2011 WL 4579601, at *4 ("A fraudulent affidavit is essentially false testimony, and as such, is intrinsic fraud which inheres in the judgment. The time to challenge such evidence is at trial, not in a petition to vacate the judgment.").

We also note that the disclosure and division of marital assets are—to paraphrase *Mauer*—matters that fall squarely within "the framework of the actual conduct" of dissolution proceedings. 257 N.W.2d at 496 (citation omitted). *Every* dissolution decree *must* "divide the property of the parties." Iowa Code § 598.21(1); *see also id.* § 598.21(5) ("The court shall divide all property . . .

equitably between the parties . . . .").  Accordingly, "[b]oth parties" to the dissolution case are required to "disclose their financial status" to the other.  *Id.* § 598.13(1)(a). "Failure to comply" with the disclosure requirement is punishable by the dissolution court as a "failure to make discovery."  *Id.* § 598.13(1)(b).  All of this suggests that marital-asset fraud is intrinsic to dissolution-of-marriage actions, not collateral. *See Hresko v. Hresko*, 574 A.2d 24, 28 (Md. Ct. Spec. App. 1990) (noting "a determination of each party's respective assets, far from being a collateral issue, would seem to be a central issue in a property settlement agreement").

We also note that this case did not involve breakdowns in the adversarial process—such as a "bribed judge" or a "dishonest attorney"—of the kind *Mauer* equated with extrinsic fraud.  *See* 257 N.W.2d at 496.  The record does not show Susan was prevented from investigating the nature of Robert's employment benefits with GE, where he was employed during ten years of their marriage.  The record does not show Susan was prevented from learning the full extent of those benefits, including the terms of Robert's retirement plans, while the dissolution case was pending.  *See* Iowa R. Civ. P. 1.1701 (authorizing subpoenas to third parties); *see also* Beverly Bird, *How to Uncover a Spouse's Retirement Funds During a Divorce*, https://finance.zacks.com/uncover-spouses-retirement-funds-during-divorce-8102.html (last visited June 15, 2021) ("Unfortunately, not every spouse is honest and straightforward when it comes to disclosing assets in a divorce.  This may be particularly true with retirement benefits that represent years and years of labor and investment. . . . .  If your spouse stalls or is uncooperative, you can issue a subpoena duces tecum to his employer, past employers, or even

to a plan administrator if you can identify it, asking for information about retirement benefits.").

Indeed, before the decree was entered—before Susan even signed the stipulation—Susan's attorney's office had the GE consent form, which Robert had asked Susan to sign. The form referred to two different retirement plans: a GE Savings & Security Program and *a GE Pension Plan*. Susan could have inquired about these plans before she signed the stipulation. She chose not to. Instead, through her notarized signature on the stipulation, Susan represented to the court that "each party has had full and fair opportunity to make inquiry" about the other party's assets "or has waived such right." And the dissolution decree itself—which Susan's lawyer "[a]pproved as to form and substance"—included this express finding: "Each party has had a full and fair opportunity to make inquiry as to assets, income and liabilities of the other or waives same." Given these facts and findings, we struggle to conclude Susan was denied "a fair submission of" the financial issues during the dissolution case. *See In re Marriage of Rhinehart*, No. 09-0193, 2010 WL 446560, at *3 (Iowa Ct. App. Feb. 10, 2010) (finding fraud was extrinsic where one party's "actions prevented a fair submission of the dissolution property/debt/spousal support issues").

For these reasons, we think there is a strong argument that Susan's action is barred because the fraud on which she relies is intrinsic. "In all matters, though, we must follow the precedents of our supreme court." *NCJC, Inc. v. WMG, L.C.*, No. 19-0241, 2020 WL 2478670, at *2 (Iowa Ct. App. May 13, 2020), *aff'd*, 960 N.W.2d 58 (Iowa 2021). And here we believe a different conclusion is required by the supreme court's opinion in *Graves v. Graves*, 109 N.W. 707, 709 (Iowa 1906).

In *Graves*, a woman brought an action against her former husband because of "false testimony" he gave in their prior dissolution case "regarding the character and amount his property, and fraudulent concealment of his property." 109 N.W.2d at 707. In their dissolution trial, the former husband had testified "that he had a little personal property, not exceeding $50 in value, and but $40 in cash, and that he had no other real or personal property of any kind or character." *Id.* As it turned out, the former husband "had, at least, $900 in money or its equivalent at the time he gave his testimony in the [dissolution] trial which he was then fraudulently concealing and keeping away from" his former wife. *Id.* at 709. The district court granted relief to the former wife. *Id.* at 707. The supreme court affirmed. *Id.* at 710.

In its opinion, the *Graves* court discussed "extrinsic" and "intrinsic" fraud at some length. The court did not, however, *explicity* classify the former husband's fraud as either kind. As explained, though, only extrinsic fraud could have permitted the former wife to obtain relief. *Id.* at 709 (noting "false swearing or perjury *alone* is not ground for setting aside or vacating a judgment" and further noting: "But, *if accompanied by* any fraud extrinsic or collateral to the matter involved in the original case sufficient to justify the conclusion that but for such fraud the result would have been different, a new trial may be granted" (emphasis added)). So we read *Graves* to mean that the former husband's fraud—his "fraudulent concealment" of assets and related "false testimony"—involved sufficient extrinsic fraud to permit relief. *But see Mauer*, 257 N.W.2d at 496 (defining "intrinsic fraud" to encompass both "perjury" and "concealment . . . of evidence").

Based on this understanding, we believe *Graves* controls the first step in our analysis. Susan accuses Robert of fraudulently concealing his pension and then furthering his fraud through his sworn signature on the stipulation. We cannot distinguish these facts from those in *Graves*, where the former husband fraudulently concealed his assets and then furthered his fraud through false testimony. *See* 109 N.W.2d at 707.

So we move on to the next step of the analysis. Here we consider whether Susan has proved a negative, so to speak, by establishing that reasonable diligence would not have permitted her to "discover the fraud . . . within one year after the judgment." *Johnson*, 489 N.W.2d at 415; *see also In re Marriage of Fitzpatrick*, No. 19-0033, 2020 WL 4497961, at *5 (Iowa Ct. App. Aug. 5, 2020) ("*She has failed to establish* that with reasonable diligence she would have been unable to assert grounds for vacating the judgment within one year after the judgment." (emphasis added)).

We conclude Susan has not met this burden. Here again we focus on Susan's response to the GE consent form. As explained, Robert provided this form to Susan on October 29, days prior to entry of the decree. The form included two check-boxes: one for *a GE Pension Plan* and one for a GE Savings & Security Program. On November 1, Susan signed this form without checking either box— and without finding out why the form referred to two different plans. Then, on November 12, Susan's attorney's office sent the signed form to Robert. Neither box was checked. Instead, the cover letter asked Robert to check the correct box. The letter also advised Robert that Susan "would appreciate" receiving a copy of the form after Robert completed it.

But no one followed up. Neither Susan nor her attorney's office followed up with Robert to obtain the completed form. As a result, Susan did not receive a copy of the completed form. If she had, she would have seen that Robert checked *both* boxes, a clear sign that he had *two* retirement funds with GE, not just one.

By failing to follow up and obtain a completed copy of the GE consent form, Susan failed to exercise reasonable diligence, which would have permitted her to learn of Robert's purported fraud within one year after the judgment.[2] *See Johnson*, 489 N.W.2d at 415. As a result, she cannot prevail in this action. We must reverse.[3]

To be clear, however, nothing in this opinion should be construed as approval for Robert's behavior concerning the GE pension. His actions were plainly wrong and perhaps criminal. *See* Iowa Code § 720.2 (classifying perjury as a class "D" felony). But everyone agrees Susan cannot obtain relief in this particular proceeding unless she showed that reasonable diligence would not have permitted her to discover Robert's fraud within one year after entry of the decree. And the record shows Susan *could have* discovered Robert's fraud within a year after the decree was entered, if not *before* it was entered. So we cannot conclude Susan is entitled to relief.[4]

---

[2] It might be objected that, even if Susan had persisted in asking for the form, Robert would have refused to provide it. In that case, though, Susan could have sought relief in court within the first year after her dissolution.

[3] We do not reach the question of whether Susan established the elements of fraud—including justifiable reliance—"by clear and convincing evidence." *See Bacon*, 2011 WL 4579601, at *4.

[4] We agree with Judge Schumacher that courts must discourage "financial trickery in dissolution of marriage proceedings." We do so here by requiring divorcing parties to police one another, so to speak, by exercising reasonable diligence to promptly discover asset-fraud.

*2. Was the district court correct in awarding part of Robert's 401k to Susan?*

Because we conclude Susan is not entitled to prevail in this action, we agree with Robert that the district court erred in awarding a portion of Robert's 401(k) to Susan. As to this issue, we reverse.

*3. Did the district court err by failing to award Robert attorney fees?*

Robert claims he was entitled to attorney fees because he obtained summary judgment as to Susan's claim for modification of the decree's spousal support award. We do not decide whether Robert was actually entitled to fees. But we do believe the district court erred in concluding that, because "attorney fees are not awardable in an action filed pursuant to Rule 1.1012," the court lacked discretion to award fees concerning count II. Rather, because count II was a modification action under Iowa Code section 598.21C, the court had "considerable discretion" in determining whether attorney fees should be awarded. *See In re Marriage of Maher*, 596 N.W.2d 561, 568 (Iowa 1999). We remand for the district court to consider the issue anew. We do not retain jurisdiction.

*4. Did the district court exceed its discretion in sanctioning Robert?*

Robert also claims the court should not have required him to pay $7056 of Susan's attorney fees as a discovery sanction. At a minimum, Robert claims, we should remand for explanation of the specific dollar amount awarded.

Trial courts have wide discretion in imposing discovery sanctions. *In re Marriage of Butterfield*, 500 N.W.2d 95, 98 (Iowa Ct. App. 1993). These sanctions may include requiring the payment of attorney fees. *In re Marriage of Galloway*, No. 02-1010, 2003 WL 1970338, at *5 (Iowa Ct. App. Apr. 30, 2003); *see In re Marriage of Mugge*, No. 07-0079, 2008 WL 4525839, at *5 (Iowa Ct. App. Oct. 1,

2008) (affirming an award of attorney fees to a wife based on the husband's failure to disclose his assets prior to a dissolution hearing).

At trial, Susan and Robert agreed that Susan could submit a redacted version of her attorney fees claim for in-camera review. However, the appellate record lacks the unredacted attorney fee statement. This impedes our review.

We acknowledge the district court's findings that Robert did not comply with discovery requests over a period of time. The court found his actions were a "blatant and willful failure to provide requested discovery." The court reviewed Susan's attorney fee affidavits and found "$7056 of [Susan's] attorney fees are directly referable to [Susan's] unsuccessful attempts to get [Robert] to provide necessary, relevant, and potentially dispositive information referable to his GE pension plan." And the district court noted that the award of attorney fees was issued as a sanction, not a matter of right. But the court expressly declined "[Robert]'s request to specify exactly how the [c]ourt arrived at the $7056 attorney fee sanction amount." This impedes our review.

We vacate the award of sanctions and remand to allow the record to be developed concerning the unredacted statement[5] and sanctions award. Consistent with *Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 834 (Iowa 2009), the

---

[5] One option is submitting the unredacted attorney fee affidavit at a higher security level. Another option would be redacting the confidential information from the affidavit, while allowing the remaining description of the work completed to be visible. Here, the entirety of the billable hour description is absent in the attorney fee affidavit contained in the appendix.

court is directed to make detailed findings of fact explaining the basis of its award.[6]

We do not retain jurisdiction.

### B. Susan's request for appellate attorney fees

In her brief, Susan requested appellate attorney fees under the assumption that she would be the prevailing party on appeal. *See Baldwin v. City of Estherville*, 929 N.W.2d 691, 700 (Iowa 2019) (noting fees can be awarded when "the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons" (citation omitted)). Ultimately, though, Susan did not prevail. Accordingly, she cannot recover appellate attorney fees.[7]

## III. Conclusion

We reverse the district court's finding in favor of Susan on count I of her petition. We vacate the modification of the dissolution decree. We vacate the award of sanctions against Robert. We remand for (1) dismissal of count I of the petition; (2) reconsideration of Robert's request for attorney fees concerning count II; (3) development of the record concerning the unredacted attorney fee statement; and (4) detailed findings of fact concerning the award of attorney fees as sanctions against Robert. We do not retain jurisdiction. We deny Susan's request for appellate attorney fees.

**REVERSED AND REMANDED.**

---

[6] To be clear: on remand, the district court may award the same amount, a greater amount, or a lesser amount. We express no opinion as to the proper amount, if any. Our concern here is to assure the record and findings are sufficiently developed for review.

[7] We do not reach the question of whether Robert's conduct would have justified an award of attorney fees.

Greer, J., concurs; Schumacher, J., concurs in part, specially concurs in part, and dissents in part.

**SCHUMACHER, Judge** (concurring in part, special concurring in part, and dissenting in part.)

The door for financial trickery in dissolution of marriage proceedings should remain firmly closed. I write specially from the majority opinion concerning the extrinsic fraud committed by Robert Hutchinson. I concur in the majority's remand on the issue of sanctions to allow the record to be developed due to the absence of the unredacted attorney fee statement for our review and concur with the majority in finding remand appropriate on the denial of Robert's attorney fees, without a determination that Robert is entitled to fees. I dissent in part from the majority opinion that concludes Susan failed to act with due diligence to discover the extrinsic fraud of her ex-husband within one year after the judgment. Accordingly, the district court's modification of the property portion of the decree should be affirmed due to Robert's failure to disclose a pension plan that Susan could not have discovered with due diligence within one year of the decree. However, because the district court ordered Susan would receive $40,117.80 from a 401(k) that Robert accumulated after the dissolution, this portion of the dissolution decree requires modification to permit Robert to pay Susan from other assets. Lastly, Robert should be required to pay $5000 toward Susan's appellate attorney fees.

In the trial on a petition to vacate filed by his ex-wife, Robert acknowledged he had the ability to notify his ex-wife of his defined benefit pension plan during settlement negotiations, "if they had asked me for it," and referred to the process as a "goat roping event." He also agreed at the time of the dissolution, his position

was, "I've got—still got a lot of life to live and this—all this stuff is just stuff. And if they miss something on there that is on them."

As noted by the majority, several drafts of a proposed settlement document circulated between the parties, with Robert requesting a reduction in values on certain assets to reduce the property settlement he would be required to pay Susan. Robert failed to alert Susan at any time during negotiations that he had a GE pension plan, which vested in 2007.

Robert signed the stipulation on October 29, 2010, at Susan's attorney's office. At the same time he signed the stipulation, Robert hand-delivered two separate forms, one relating to a premarital Fidelity account and the other being a blank GE consent form. The GE 401(k) was the only retirement vehicle Robert disclosed in the stipulation that Robert had just signed. Robert informed Susan's attorney the purpose of the GE form was for Susan to release her death benefits so he could redirect them to his children.[8] On November 1, 2010, Susan signed a Spouse's Consent to Waive Right to Benefits in a GE Enrollment Center Consent form. The form had two boxes, one for the GE Pension Plan and one for the GE Savings & Security Program. Susan did not check either of the boxes. This was a generic form. In a letter transmitting the executed form, a legal assistant for Susan's attorney asked Robert to "[p]lease confirm . . . which plan you are participating in (GE Pension Plan or GE Savings & Security Program) and check the appropriate box." The legal assistant asked for a copy of the form when

---

[8]As noted by the majority, Robert changed the death benefits beneficiary; his children were not named as the recipients of those benefits.

completed. Robert checked both boxes and gave the GE form to his employer. He did not provide a completed copy of the form to Susan's attorney.

On November 2, 2010, the district court issued a dissolution decree that incorporated the stipulation. The decree awarded Robert his GE 401(k) account. There is no mention of a GE pension plan.

As noted by the majority, nearly five years after the entry of the dissolution decree, Robert requested Susan sign a satisfaction of alimony judgment. At this meeting, Robert informed Susan he had retired and was receiving a "nice pension." As highlighted by the majority, Robert pointed to the satisfaction Susan had just signed and said, "It's too late. You can't do anything about it now."

In Susan's petition to correct, vacate, or modify the dissolution decree filed April 20, 2016, she alleged Robert had an interest in a GE pension plan that was not disclosed at the time of the dissolution and she only recently discovered the pension. Susan claimed Robert's conduct constituted extrinsic fraud because it prevented a fair submission on the issue of property division. Susan asked to have the property division provision of the dissolution decree modified to award her an equitable share of the GE retirement plan.[9]

After several discovery skirmishes and trial on the petition to vacate, the district court found Robert intentionally deceived Susan about the existence of the pension plan and all of the elements of fraud were met. The court found the "fraud could not have been discovered earlier in the exercise of due diligence." The court

---

[9] In the alternative, Susan sought a modification of the spousal support award. The district court granted Robert's motion for summary judgment on this issue. That portion of the district court's ruling has not been challenged on appeal.

determined Robert's action constituted extrinsic fraud "because it prevented Susan from even having the issue of the distribution of any such GE Pension addressed." The court stated:

> Susan was not given the opportunity to fairly present evidence referable to the GE pension because [Robert] affirmatively concealed its existence. This is not a situation where there was perjured testimony or false evidence presented upon which the judgment was based. Rather, [Robert's] extrinsic fraud was collateral to the proceedings and pertained exclusively to the manner in which the judgment/decree was procured. The concealment of the GE Pension was collateral to the matter already adjudicated in the Stipulation and Decree.

The court concluded that under Iowa Rule of Civil Procedure 1.1013(1), the case could be brought more than one year after the date of the dissolution decree because it involved extrinsic fraud.

The court determined the stipulation showed the parties intended to equally divide the marital assets. The court found Susan should receive a monthly pension benefit of $668.63. The court also ordered Robert to reimburse Susan $40,117.80 for the previous months he had been receiving a pension, which would be paid from Robert's 401(k) accumulated under a subsequent employer, Integrated Sales. The court concluded the parties should each pay their own attorney fees for the action. However, Robert was ordered to pay $7056 of Susan's attorney fees as a discovery sanction.

Susan filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2). Robert did not resist Susan's motion and filed his own motion. The court made some changes to the language of its decision. Robert appealed the district court's ruling.

**Extrinsic Fraud v. Intrinsic Fraud**

I write separately to address the issue of extrinsic fraud that has vexed the family law practice. As noted in the majority opinion, in general, a motion to set aside a dissolution decree must be filed within one year after the decree is entered. *See* Iowa Rs. Civ. P. 1.1012, 1.1013. An action may be filed in equity more than one year after a judgment, however, where a party claims an inability to "discover the fraud or other grounds for vacating the judgment within one year after the judgment." *Johnson v. Mitchell*, 489 N.W.2d 411, 415 (Iowa Ct. App. 1992). An equitable action filed more than one year after a judgment requires a showing "that the fraud [is] extrinsic and collateral to the proceedings and issues in the original case." *Id.* "A party attempting to vacate a judgment in an equity suit has a heavy burden." *Id.*

There are two types of fraud: intrinsic and extrinsic. *In re B.J.H.*, 564 N.W.2d 387, 391 (Iowa 1997). "Extrinsic fraud 'is some act or conduct of the prevailing party which has prevented a fair submission of the controversy.'" *Id.* (citation omitted). Extrinsic fraud "includes lulling a party into a false sense of security or preventing the party from making a defense." *Id.* (citation omitted). It "pertains to the manner in which the judgment was procured." *In re Marriage of Kinnard*, 512 N.W.2d 821, 823 (Iowa Ct. App. 1993).

"A fraudulent concealment of facts which would have caused the judgment not to have been rendered will constitute extrinsic fraud." *Bradley v. Bd. of Trs. Of Washington Twp., Dubuque Cnty.*, 425 N.W.2d 424, 425 (Iowa Ct. App. 1988). Extrinsic fraud must be shown by clear, unequivocal, and convincing evidence in

order to justify setting aside a judgment. *Miller v. AMF Harley-Davidson Motor Co.*, 328 N.W.2d 348, 344 (Iowa Ct. App. 1982).

On the other hand, intrinsic fraud does not constitute grounds to vacate a judgment. *Phipps v. Winneshiek Cnty.*, 593 N.W.2d 143, 146 (Iowa 1999). "[I]ntrinsic fraud inheres in the issues submitted to the court." *Id.* "Intrinsic fraud 'occurs within the framework of the actual conduct of the trial and pertains to and affects the determination of the issue presented therein. It may be accomplished by perjury, or by the use of false or forged instruments, or by concealment or misrepresentation of evidence.'" *Mauer v. Rohde*, 257 N.W.2d 489, 496 (Iowa 1977) (citation omitted). "A claim of false testimony constitutes intrinsic fraud." *Phipps*, 593 N.W.2d at 146; *see also B.J.H.*, 564 N.W.2d at 391 ("[I]ntrinsic fraud inheres in the judgment itself; it includes, for example, false testimony and fraudulent exhibits.").

The district court concluded Susan met her burden to show that this case involved extrinsic fraud, stating, "Courts have found concealment of financial assets to amount to fraud collateral to the matter already adjudicated." (Citing *Graves v. Graves*, 109 N.W. 707, 709 (Iowa 1906); *In re Marriage of Rhinehart*, No. 09-0193, 2010 WL 446560, at *3 (Iowa Ct. App. Feb. 10, 2010)).

In *Graves*, an action to set aside a dissolution decree was filed more than one year after the decree was entered "because of false testimony given by [the husband] in the original proceeding, regarding the character and amount of his property, and fraudulent concealment of his property." 109 N.W. at 707. The district court granted the wife's request for a new trial and the matter was appealed. *Id.*

The Iowa Supreme Court noted, "false swearing or perjury upon the original trial is not such fraud as will authorize the granting of a new trial." *Id.* at 708. The court stated that in order to set aside a decree, there must be "some active fraud, omission, or concealment, some extrinsic or collateral acts not involving the merits of the case." *Id.* at 709. Also, "if accompanied by any fraud extrinsic or collateral to the matter involved in the original case sufficient to justify the conclusion that but for such fraud the result would have been different, a new trial may be granted." *Id.* The court affirmed the district court, concluding the husband "has no cause for complaint of the action of the trial court," noting his false testimony and fraudulent concealment of property. *Id.*

In *Rhinehart*, more than one year after a dissolution decree was filed, a wife filed a petition seeking to set aside the decree based on extrinsic fraud. 2010 WL 446560, at *1. She claimed the husband did not disclose certain assets. *Id.* The district court denied the husband's motion to dismiss on the ground the petition to set aside was untimely. *Id.* The Iowa Court of Appeals found the husband had not disclosed all of the assets held by his law practice. *Id.* at *3. The court determined the husband committed extrinsic fraud, as his "actions prevented a fair submission of the dissolution property/debt/spousal support issues." *Id.* We affirmed the decision of the district court. *Id.* at *4.

Robert's concealment of his GE pension plan prevented a fair submission of the issue of property division to the court. *See Bradley*, 425 N.W.2d at 425 ("A fraudulent concealment of facts which would have caused the judgment not to have been rendered will constitute extrinsic fraud."). This case does not hinge on false testimony or documents, which would have constituted intrinsic fraud. *See*

*B.J.H.*, 564 N.W.2d at 391. "Where a decision-making authority is misled as to material circumstances resulting in a judgment which would not have been given if the whole conduct of the case had been fair, that authority has the power to vacate for fraud and modify the decision." *Bradley*, 425 N.W.2d at 425. If not for Robert's complete concealment of his GE pension plan, the property division in the parties' dissolution decree would have been different. *See Graves*, 109 N.W. at 709. While Robert did swear under oath that he fully disclosed his assets, which could potentially be interpreted as false testimony, the larger issue is the concealment of the pension, which affected the judgment. The district court's determination that the complete concealment of the pension involves extrinsic fraud should be affirmed. *See id.*; *Rhinehart*, 2010 WL 446560, at *3.

**Exercise of Reasonable Diligence**

Robert claims, and the majority agrees, even if this case involves extrinsic fraud, Susan's petition is untimely because she did not exercise reasonable diligence in discovering his concealment of the GE pension plan. *See Graves*, 109 N.W. at 709 ("Of course, if plaintiff discovered the alleged fraud and false swearing within a year, or, by the use of reasonable diligence on her part might have discovered it within that time, she should not be allowed to prosecute this proceeding in equity."). It is this portion of the test the majority alleges Susan failed to pass. I respectfully dissent.

Robert did not provide any information about his participation in the GE pension plan while the parties were negotiating the stipulation, which was subsequently incorporated into the parties' dissolution decree. The stipulation stated, "The parties have provided updated information to each other for the values

of these accounts/plans as of June 2010, or the closest date for which financial information is available," so Susan would have expected that Robert provided her with all of the pertinent information available concerning his pension plan.

Robert presented Susan with a form that had two boxes, one for the GE pension plan and one for the GE 401(k). A legal assistant at the law firm representing Susan asked Robert to mark which plan he was participating in and return the form. Although Robert was participating in both plans, he did not return the form to Susan's attorney. Thus, Susan asked for relevant information about whether Robert was participating in the GE pension plan, but Robert did not disclose the necessary information. While the majority highlights that Susan should have followed through with requesting a copy of the form, this underscores both the timing of Robert presenting the form and that Robert had simultaneously signed a stipulation declaring that the only retirement fund he owned was a GE 401(k) plan. Robert essentially argues that although he failed to disclose the pension, failed to provide a copy of the executed consent form, and indicated full disclosure simultaneously with the delivery of the generic consent form, he is shielded because Susan should have done more to discover his deception. Given the generic nature of the form and language that accompanied the boxes, along with Robert's statement to Susan's counsel that the purpose of the form was to change the death benefits to his children, even the return of the executed form to Susan may not have triggered "an aha moment" and alerted her to the undisclosed pension.

It is critical to consider the practical ramifications inherent in holding contrary to the district court's determination. Such a finding invites litigants to sophisticate

their efforts to conceal property. This is an invitation our courts should not extend. Accordingly, I would affirm the district court's conclusion that Susan exercised reasonable diligence to discover whether Robert was participating in the GE pension plan. *See id.* Susan should not be prohibited from seeking to set aside the property division provision of the dissolution decree due to a lack of reasonable diligence. *See id.*

**Justifiable Reliance**

In order to establish fraud, a plaintiff is required to show:

(1) [the] defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation . . . , (7) the representation was a proximate cause of [the] plaintiff's damages, and (8) the amount of damages.

*Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012) (alterations in original) (citation omitted). Robert disputes just one element—justifiable reliance. He claims Susan did not show she justifiably relied on Robert's failure to disclose his participation in the GE pension plan.

"Justifiable reliance is an essential element of a claim for fraud." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 736 (Iowa 2009). "[T]he justified standard followed in Iowa means the reliance does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances." *Id.* "The justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation." *Id.* "Instead, the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the

transaction is considered to determine if the justifiable-reliance element has been met." *Id.*

The district court found Susan justifiably relied on the documents submitted by Robert swearing under oath the GE 401(k) plan as his only retirement plan. According to the parties' stipulation, "Each party states that they have fully disclosed all of their assets, income and liabilities to the other and that each party has had full and fair opportunity to make inquiry as to the same or has waived such right." Also, Robert signed the stipulation "being first duly sworn on oath," declaring that the statements in the stipulation were true. Based on Robert's signed statement that the information provided in the stipulation was true and his obligation to fully disclose all of his financial information, the district court's conclusion that Susan justifiably relied on the information provided by Robert should be affirmed.

**Form of Relief**

Robert claims the district court did not have authority to award Susan a portion of his Integrated Sales 401(k) account. Robert asked that any relief to Susan be in the form of a money judgment so he could select how the judgment would be paid. Susan concedes that the court did not have authority to divide Robert's Integrated Sales 401(k) because this asset was acquired following the parties' divorce.

Although Susan agrees that she is not entitled to a portion of the 401(k) that Robert accumulated after the divorce, she states Robert should still be required to pay her $40,117.80, representing her share of the GE pension plan Robert concealed. Susan testified any asset held by Robert, "as long as it's an equitable

asset," could pay the amount. The district court improperly ordered that Susan would receive $40,117.80 from Robert's Integrated Sales 401(k). Robert should pay Susan $40,117.80 within sixty days after procedendo, with interest from the date of this ruling, from other available assets.

**Appellate Attorney Fees**

Susan requests attorney fees of $5000 for this appeal. Susan asserts Robert acted with bad faith, justifying an award of appellate attorney fees. "Generally, attorney fees are recoverable only by statute or under a contract. There is a rare exception to this rule that permits the recovery of attorney fees when the defendant 'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Quad City Bank & Tr. v. Elderkin & Pirnie, P.L.C*, 870 N.W.2d 249, 259 (Iowa Ct. App. 2015) (citation and footnote omitted). Based on Robert's statements that he could have disclosed the plan, coupled with his efforts to conceal the same, Susan has shown the requisite level of bad conduct necessary for an award of attorney fees for this appeal. Her request should be granted.

**Conclusion**

Accordingly, I would affirm in part as modified, reverse in part, and remand. Specifically, I would affirm the district court as to the finding that the fraud committed by Robert was extrinsic and that Susan could not have discovered the fraud with due diligence. I would modify the requirement that Robert pay Susan from his Integrated Sales 401(k) account to allow payment from other assets. I concur with the majority to reverse the attorney fees awarded as sanctions and remand for the limited purpose of development of the record concerning the unredacted attorney fee statement. And I concur with the majority's remand as to

Robert's request for attorney fees on Susan's request for modification of the alimony award, which was dismissed by the trial court, without a determination on the merits of his request. Finally, Susan should be awarded appellate attorney fees.